Filed 5/6/16  P. v. Ramirez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL RAMIREZ,<br><br>    Defendant and Appellant. | A143981<br><br>(Contra Costa County<br>Super. Ct. No. 5-132103-3) |

Samuel Ramirez was convicted by a jury of 26 counts of committing a forcible lewd act on a child under the age of 14.  The offenses involved a single victim, Ramirez's stepdaughter, Jane Doe.  He was sentenced to state prison for 156 years and ordered to pay Doe $900,000 in noneconomic restitution.  On appeal, Ramirez contends:  (1) the trial court abused its discretion in admitting evidence of uncharged sexual offenses pursuant to Evidence Code sections 1101 and 1108;[1] (2) the trial court abused its discretion in admitting certain expert testimony; (3) his trial counsel was ineffective in failing to object to the admission of hearsay; (4) the cumulative impact of alleged errors requires reversal; and (5) the trial court's restitution award constitutes an abuse of discretion.  We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Ramirez was charged by information with 26 counts of committing a forcible lewd act on Doe, a child under 14 (Pen. Code, § 288, subd. (b)(1)).  The 26 offenses were

---

[1] Undesignated statutory references are to the Evidence Code.

1

alleged to have occurred in Rodeo between December 1, 1993, and December 31, 1994. It was further alleged that the statute of limitations was extended and Ramirez was ineligible for probation because the offenses involved substantial sexual conduct (Pen. Code, §§ 803, subd. (f), 1203.066, subd. (a)(8)).

Prosecution's Case

*Doe's Testimony*

Doe was 30 years old at the time of trial. Although Ramirez was technically her stepfather, Doe considered Ramirez her father. She had known him since she was two years old, when he and her mother, Sandra, moved in together.[2] Doe's family also included her three siblings, Benjamin, Cruz, and Casandra (respectively ages 35, 22, and 21 at the time of trial), as well as two stepsiblings.

The family lived in Los Angeles until 1991. When Doe was about eight years old, they moved to Mill Valley into a three bedroom duplex, where the molestations began. During the time they lived in Mill Valley, Ramirez entered Doe's bedroom a couple of times a week or every couple of days, in the middle of the night, pulled her covers down, removed her pants and underwear, and touched her buttocks and vagina. "It was always the same."

The family moved again sometime between April 1993 and April 1994, when Doe was nine or 10 years old, to a four-bedroom house in Rodeo. In Rodeo, the molestations continued. In addition to fondling her, sucking on her nipples, and kissing her, Ramirez began to orally copulate Doe and lick her anus. Although Doe could not remember the number of incidents, the molestations were frequent—occurring approximately several times a week. The acts generally followed a consistent pattern.[3] Doe began wearing

_____

[2] Ramirez and Sandra did not marry until Doe was an adult, in approximately 2008. They divorced several years later.

[3] On one memorable occasion in Rodeo, Ramirez had been drinking at the neighbors' house and came home momentarily in the late afternoon to retrieve a forgotten item. On encountering Doe at home alone, he ripped off her shirt, hugged and French kissed her, and kissed her chest.

multiple layers of clothing to bed, trying to hold up her pants before Ramirez forced them down, and crossing her legs in an attempt to protect herself. Ramirez said "please" and "come on" and she could not stop him. Generally, Doe would just "lay there lifelessly," sometimes crying.

The family moved to a three-bedroom house in Vallejo. The molestations remained similar but became less frequent—happening approximately every other week. When Doe was about 11, the family moved yet again to a residence at San Quentin, where Ramirez worked as an electrician. The abuse in San Quentin occurred less frequently than in Vallejo. Doe started saying "no." Ramirez stopped orally copulating Doe, but he continued to touch her vagina and buttocks. He began waking her up in the morning by massaging her feet, touching her vagina, and applying lotion. When Doe would say "no," Ramirez responded, "I'm not hurting you." On one occasion, she woke up and Ramirez was trying to rub his exposed penis with her hand. That was the last time Ramirez tried to touch her. When Doe was 16, the family moved to Jamestown. She moved out a year later and lived with her boyfriend in Sonora.

Ramirez never verbally threatened Doe and never used physical violence during the molestations. She just laid there, not understanding what was happening. However, Doe felt trapped, scared, humiliated, and confused whenever Ramirez molested her. Although Ramirez never spanked her during any of the molestations, this discipline was part of the fear Doe experienced.[4] She feared that, if she resisted or "said anything," she would be spanked. Doe felt trapped because Ramirez was in control and "what he said went." While the molestations were occurring, Ramirez never told her it was a secret or not to tell anyone. Nonetheless, she did not tell anyone because she felt scared and humiliated. Doe waited a very long time to tell her mother because she did not want to destroy what appeared to be a happy marriage. Having a daughter herself gave Doe the strength to come forward.

---

[4] When Doe misbehaved, Ramirez disciplined her by spanking her bare bottom with his hand.

3

In approximately 2008, when Doe was about 25 years old, she asked Ramirez why he molested her. He said he had "a sickness." Around 2012, when Doe was approximately 28 or 29, she learned that Sandra and Ramirez were separating. Around the same time, Doe told Sandra and her older brother, Benjamin, that Ramirez had molested her. At a family meeting to discuss Sandra and Ramirez's separation, Ramirez admitted molesting Doe. Doe reported the abuse to police in March 2013.

*Siblings' Testimony*

Doe's younger brother, Cruz, attended the 2012 family meeting and heard Ramirez admit he molested Doe. After that meeting, Ramirez wrote Cruz a letter, in which he referred to "the revelation of my past with your sister." Doe's younger sister, Casandra, also attended the 2012 family meeting. She heard Ramirez say, "I molested your sister, [Doe]."

*Police Investigation*

Sergeant Deborah Moss, of the Tuolumne County Sheriff's Office, testified that Doe reported the abuse on March 26, 2013. Doe said the abuse began in Mill Valley when she was around seven years old and in the fourth grade. In fifth grade they moved to Rodeo. Doe told Moss that, while in Rodeo, Ramirez came into her room every night or every other night and touched her vagina, kissed her lips and breasts, and orally copulated her.

Moss arranged a pretext call between Doe, Casandra, and Ramirez, which was played for the jury. Ramirez admitted the molestations, which he said began in Rodeo when Doe was seven or eight. He attributed the molestations to a "sickness."

*Police Interview of Ramirez*

On April 17, 2013, Moss and Detective Kenny Hutton interviewed Ramirez. Ramirez admitted that he molested Doe. He denied ever orally copulating Doe, and he did not remember molesting her as frequently as twice a week. However, Ramirez conceded that if Doe claimed that many molestations he would not disagree. He remembered four episodes in the Rodeo house, only two of which involved touching Doe's vagina. He also denied any molestations occurred in Mill Valley. But Ramirez

4

remembered six to 10 incidents at the San Quentin residence when he had Doe masturbate him. At the end of his statement to police, Ramirez wrote a letter to Doe in which he admitted, among other things, rubbing her vagina, breasts, and buttocks, and using her hand to masturbate him.

*Police Interview of Doe*

On April 29, 2013, Hutton took a more extensive interview of Doe. In its case-in-chief, the prosecution introduced an abbreviated video and transcript of the April 2013 interview. In this abbreviated version, Doe told Hutton the molestations began in Mill Valley. At that time, Ramirez would come into Doe's bedroom about once a week, or every other night, pull her pajamas down and "touch[ed]" and "finger[ed]" her. In Rodeo, Ramirez continued molesting her every other day and began performing oral sex. He would also try to kiss her and get her to touch him. Although Ramirez never threatened her or used violence, she thought she would get in trouble if she did not cooperate. Ramirez exposed his penis "sometimes."

*Expert Witness's Testimony*

Sergeant Antonio Benavides, an investigator with the Contra Costa County District Attorney's Office, testified as an expert in delayed disclosure, evolving disclosure, victim behavior, and the profile of sexual abusers. Benavides testified that some victims of sexual abuse will delay disclosure because of confusion, fear, shame, guilt, and self-blame. Also, if the abuser is someone who has control or power over the victim, it may take longer for the victim to come forward.

Defense Case

Ramirez was the only defense witness. He testified that when he met Sandra in 1987, she already had two children—Benjamin and Doe. He and Sandra began living together about a year after they met, had a child together in 1991, and finally married in 2005.

Ramirez drank heavily throughout Doe's childhood. For example, on a typical weeknight, he drank four or five beers and a similar number of mixed drinks. He quit

5

drinking in October 2004. Ramirez admitted spanking Doe, although he probably spanked her less than 10 times total.

Ramirez denied ever molesting Doe. He had consensual sex with her when she was 16. While Sandra, Benjamin, and the younger siblings moved the family's belongings to their new home in Jamestown, Ramirez and Doe stayed an extra day to paint the San Quentin home. Ramirez went to bed around 9:00 p.m., after consuming about nine beers and half a fifth of vodka. He awoke to find Doe holding his penis. He grabbed her hand and asked, "What are you doing?" After Ramirez tried to push her hand away, she said, "No. Don't stop me. I wanted this and I know you want it too."[5] Ramirez stopped resisting and had intercourse with Doe.

In 2010, Doe told Ramirez that she wanted to talk with him about what happened. She said that what they had done was weighing on her, and she felt the need to disclose it. Ramirez offered to talk with Sandra immediately, but they agreed it would crush her. Ramirez offered to take responsibility and suggested he could tell Sandra he molested Doe. Doe approved of that approach. Ramirez decided that admitting to molestation would help Doe "come to terms with this."

In October 2012, the family, including Doe, met to discuss the division of marital assets. At the meeting, Doe asked Ramirez, "Don't you have something to say to the family?" Ramirez "could tell just what she wanted me to say," so he said, "I molested your sister." Doe said that if Ramirez signed certain papers and made sure Sandra never had to work again, she would not pursue the matter. Ramirez later signed an asset agreement, in which he "[gave] up virtually everything." In his letter to Cruz, Ramirez's reference to "my past with your sister" was a reference to the 1999 incident when Doe was 16, "but of course nobody knew that."

During the pretext call, Ramirez felt he was unable to defend himself. He felt that telling the truth would be worse. He therefore made up the idea that he had a "sickness"

---

[5] Ramirez said Doe had entered his bedroom not fully dressed on four or five previous occasions.

and hoped "[Doe and Casandra] would accept [this] so that [they] could move on." When the police interviewed him, Ramirez decided to continue lying. Since the family had already alienated him, he did not think his predicament could get worse. He also lied to police to protect Sandra and Doe and to provide Doe with closure. He was not concerned that he was admitting crimes because the police had assured him that his case was less serious. Ramirez fabricated details or took a nonsexual situation and sexualized it. The letter he wrote to Doe at the end of the interview incorporated things suggested by Hutton.

Rebuttal

In rebuttal, the prosecutor played the complete recording of Doe's April 2013 interview, which was largely consistent with her testimony at trial.

Verdict and Sentence

Ramirez was convicted of all 26 counts and all special allegations were found true. He was sentenced to state prison for a total term of 156 years. The trial court also ordered Ramirez to pay $900,000 in restitution to Doe for pain and suffering. Ramirez filed a timely notice of appeal.

**II.    DISCUSSION**

Ramirez contends: (1) the trial court erred in admitting evidence of uncharged sexual offenses pursuant to sections 1101 and 1108; (2) the trial court abused its discretion in admitting Benavides's expert testimony; (3) his trial counsel was ineffective in failing to object to the admission of Doe's out-of-court statements to police; (4) the cumulative impact of the alleged errors requires reversal; and (5) the trial court's restitution award constitutes an abuse of discretion. None of Ramirez's arguments has merit.

A.    *Admission of Evidence of Uncharged Sexual Offenses*

Over Ramirez's section 352 objection, the trial court admitted, under sections 1101 and 1108, evidence of uncharged sexual offenses against Doe in addition to

evidence of the 26 charged molestations (which occurred in Rodeo during 1993–1994).[6] Ramirez insists this was an abuse of discretion and deprived him of a fair trial.

"Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. ( . . . § 1101.) However, the Legislature has created exceptions to this rule in cases involving sexual offenses ( . . . § 1108) and domestic violence (. . . § 1109)." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) Section 1108 "allows evidence of the defendant's uncharged sex crimes to be introduced in a sex offense prosecution to demonstrate the defendant's disposition to commit such crimes." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009.)

"Under . . . section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) A trial court's exercise of its discretion under section 352 " 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Rodrigues*, at pp. 1124–1125; accord, *People v. Story* (2009) 45 Cal.4th 1282, 1295.) "[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under . . . section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169.)

---

[6] Section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

1. *Background*

In pretrial motions, the prosecution moved to admit evidence of Ramirez's uncharged sexual offenses involving Doe, pursuant to section 1108. Ramirez opposed the motion, arguing the evidence was unduly prejudicial. The trial court agreed with the prosecutor that the uncharged acts were admissible under sections 352, 1101, and 1108. The court explained its ruling as follows: "[I]t seems to me the history between them would be relevant to [the force] issue with a child starting at age seven years old. [¶] I have considered 352 and the obvious prejudice from that long history of alleged abuse, but I think the probative value is very substantial and outweighs the prejudicial effect."

2. *Analysis*

Ramirez contends that the probative value of Doe's testimony regarding uncharged offenses was outweighed by its prejudicial effect and that "[t]he hundreds of additional uncharged acts . . . should have been excluded under . . . section 352." We disagree.

Section 1108 reflects a legislative determination that " 'evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of . . . section 1101.' " (*People v. Britt* (2002) 104 Cal.App.4th 500, 505–506, italics omitted; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 405.) "Under section 1108, courts . . . retain broad discretion to exclude disposition evidence if its prejudicial effect, including the impact that learning about defendant's other sex offenses makes on the jury, outweighs its probative value." (*People v. Falsetta* (1999) 21 Cal.4th 903, 919.)

In weighing prejudice against probative value under section 352, "five factors stand out as particularly significant in [a] . . . section 1108 case. These factors are (1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to

9

confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time. [Citation.]  A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)

"[T]he probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense. [Citation.] . . . [T]he prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term, ensuring that the jury would not be tempted to convict the defendant simply to punish him for the other offenses, and that the jury's attention would not be diverted by having to make a separate determination whether defendant committed the other offenses." (*People v. Falsetta, supra,* 21 Cal.4th at p. 917.)  In assessing prejudice, we must remember that "[t]he prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Applying these factors here, we conclude Doe's testimony had significant probative value and was not "cumulative," as Ramirez suggests.  The uncharged conduct was extremely similar to the charged conduct and was part of a recurrent pattern of abuse, wherein the incidents occurred very close in time.  Doe's testimony regarding the early molestations, which began when she was about eight, was also relevant to place the charged offenses in context.  Specifically, her testimony about these early offenses, if

10

true, tends to explain why Doe felt forced to submit to the sexual activity in the charged offenses.

Evidence of Ramirez's uncharged acts was no more inflammatory than Doe's testimony regarding the charged offenses, so any additional prejudicial effect was minimal.  (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 725–726 ["[w]hatever emotional bias might have been invoked against [the defendant] at trial, would have been fully invoked by the multitude of horrific crimes actually charged . . . [, and] additional evidence suggesting he may have done more of the same [to the same victim], would not significantly change the jury's perception of him"].)  Doe was only about seven or eight years old when the uncharged offenses began.  However, we cannot say that these early acts were qualitatively different or any more inflammatory than the facts underlying the charged crimes, which also involved oral copulation.  We cannot agree with Ramirez that the number of uncharged offenses was unduly prejudicial standing alone.  As Ramirez concedes, the charged acts were also numerous.

Ramirez also contends the evidence should have been excluded because the uncharged acts were "remote, unpunished, and unverified by a third victim or witness."  We agree with the People that there was essentially no gap between the charged and uncharged offenses.  Even if we look only at the first or last uncharged offenses, they occurred within a few years of the charged offenses, which is not remote.  (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 992 [upholding admission of uncharged sexual assault occurring 34 years before charged sexual offense].)  The probative value of this testimony may not be heightened because Doe was the victim in all of the offenses.  We also agree that there was some risk that the jury would be tempted to convict Ramirez of the charged offenses, regardless of guilt, to assure that he would be punished for the uncharged offenses.  (See *People v. Merriman* (2014) 60 Cal.4th 1, 59; *People v. Balcom* (1994) 7 Cal.4th 414, 427.)  However, the trial court weighed these factors, none of which are dispositive.  (*Merriman*, at p. 59.)

Most importantly, because of the similarity of all the acts and Ramirez's uniform defense that none of the acts occurred, it is highly unlikely the jury would return a guilty

11

verdict based upon the uncharged misconduct rather than the charged offenses. If the jury was not inclined to believe Doe's testimony regarding the charged acts, it is highly unlikely that hearing her testimony about uncharged acts would have changed the jury's assessment. (*People v. Ennis, supra,* 190 Cal.App.4th at p. 734.) The risk of prejudice was also significantly reduced by the court's instruction to the jury, pursuant to CALCRIM No. 1191, that the evidence of uncharged sexual offenses "is not sufficient by itself to prove that the defendant is guilty . . . . The People must still prove each charge beyond a reasonable doubt." [7] Juries are presumed to follow the instructions given. (*People v. Pinholster* (1992) 1 Cal.4th 865, 919, disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405,458–459.)

In light of all of the above circumstances, the trial court did not abuse its discretion when it concluded that the probative value of the uncharged acts testimony was not outweighed by its risk of undue prejudice. Because the trial court properly admitted the evidence under section 1108, we do not consider whether, as Ramirez suggests, the trial

---

[7] Pursuant to CALCRIM No. 1191, the jury was instructed: "The People presented evidence that the defendant committed the crimes of Forcible Lewd Act upon a Child or Lewd Act upon a Child under 14 that were not charged in this case. These crimes are defined for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit, and did commit Forcible Lewd Act upon a Child as charged in Counts 1 through 26, or Lewd Act upon a Child under 14, which is a lesser charge as to each count. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Forcible Lewd Act upon a Child or Lewd Act upon a Child under 14. The People must still prove each charge beyond a reasonable doubt."

12

court abused its discretion in also admitting the evidence under section 1101. (*People v. Story, supra,* 45 Cal.4th at p. 1295; *People v. Britt, supra,* 104 Cal.App.4th at p. 506.)

B.     *Admission of Expert Testimony*

Next, Ramirez contends the trial court abused its discretion in admitting Benavides's expert testimony related to child sexual abuse accommodation syndrome (CSAAS). Specifically, he maintains Benavides implicitly vouched for Doe's credibility by opining on the significance of facts too closely mirroring her testimony. We disagree.

"As a general rule expert opinion testimony is limited to an opinion that is '[r]elated to a subject that is sufficiently beyond common experience that the opinion . . . would assist the trier of fact.' (. . . § 801, subd. (a).) Because admissibility of expert opinion is a question of degree, and a jury need not be wholly ignorant of the subject matter under the statutory rule, exclusion is only necessary where the opinion would add nothing at all to the jury's common fund of information. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299–1300.) For example, courts have repeatedly recognized the appropriate use of expert testimony when an alleged victim's actions during or following a crime seem to contradict the victim's claims in cases of alleged molestation or abuse. (See *People v. Riggs* (2008) 44 Cal.4th 248, 293 [expert testimony addressing battered woman's syndrome]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [expert testimony concerning [CSAAS]].) 'A trial court's decision as to whether a particular subject is a proper one for expert opinion is reviewed for abuse of discretion.' " (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110.)

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.) Although expert testimony on the common reactions of a child molestation victim is not admissible to prove a charged sex crime actually occurred, " 'CSAAS testimony "is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the

13

child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." ' " (*People v. Perez* (2010) 182 Cal.App.4th 231, 245; accord, *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).)

The *Bowker* court outlined limitations on the admission of CSAAS evidence. First, the evidence "must be targeted to a specific 'myth' or 'misconception' suggested by the evidence," such as the significance of delayed reporting. (*Bowker, supra*, 203 Cal.App.3d at pp. 393–394.) Second, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is *admissible solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence *are not inconsistent* with having been molested." (*Id.* at p. 394, some italics added.)

### 1. *Background*

In advance of trial, Ramirez filed a motion to exclude testimony from the prosecution's proposed expert psychologist, Dr. Anthony Urquiza. Ramirez argued Urquiza's proposed testimony on CSAAS was irrelevant and not accepted in the scientific community. Ramirez also argued that, if the expert were to testify, opinions regarding Doe's credibility should be excluded. The prosecutor responded that the admission of CSAAS expert testimony is approved in sexual assault cases. The prosecutor specifically noted the evidence's relevance to this case, saying, "[t]here [are] delayed disclosures, there are [victim] behaviors, and there was grooming, and there was dissuasion and there was force, all of which arise and are described in CSAAS."

The trial court explained it would need to hear the cross-examination of Doe because "whether there are myths to be dispelled will depend on what she says." However, the court also said, "I do understand there's at minimum the issue of delayed disclosure for many years here, so I think it's likely that I will admit [the expert's] testimony. [¶] . . . [¶] I can't in advance give specific rulings as to what questions are admissible and what questions are not. [¶] I would generally keep his testimony to the valid purposes of type of expert testimony to dispel myths . . . ."

14

After Doe testified, however, the prosecution gave notice that the testimony of Benavides would be offered instead to provide "information related to the late disclosure and evolving disclosure, victim behavior, general sexual assault investigation . . . and [to] very, very, very narrowly have him testify . . . that there is no profile of the sexual assault perpetrator . . . ." Ramirez's trial counsel submitted on the admissibility of delayed disclosure expert testimony, but he also made clear that he believed the testimony should be limited so that "no hypotheticals would be proposed and no specifics about this . . . case would be discussed."

The trial court concluded the evidence was admissible and explained: "I do think . . . people do have misimpressions about child sexual assault victims and how they are likely to behave and the significance of a delayed or evolving disclosure. So I think it is helpful to the jury to have the general expertise about the experience in this field. . . . [¶] . . . [¶] I will impose the limitations that are required by the case law; that is, *there should be no hypotheticals mirroring the facts of this case and no elicitation of an opinion on the question whether the victim in this case was, in fact, a victim of child sexual assault.* [¶] I will provide [a] limiting instruction to the jury on the nature of this testimony . . . ."

Benavides was qualified as an expert in delayed disclosure, evolving disclosure, victim behavior, and the profile of sexual abusers. At the conclusion of his voir dire of Benavides, Ramirez's trial counsel said, "I'll just restate my earlier objection from the in limines and submit." Ramirez's continuing objection to Benavides's testimony is only to particular instances of his testimony. Specifically, Ramirez challenges Benavides's response to the following inquiry from the prosecutor: "Have you had any cases specifically where there's . . . a familial relationship or a father/child-type relationship?" Benavides responded, "Yes. [¶] . . . [¶] [S]uspects have described just using the power that they have . . . as a father or as the . . . patriarch of the house. [¶] They've also described using fear or using gifts or . . . generally just trying to keep the victim on their good side to prevent them from disclosing."

Benavides also testified regarding delayed disclosures: "[F]or example when you have a . . . father/daughter type of relationship or a close familiar relationship . . . you

15

may have a reluctance to report because of a fear that that person that they love, that they care about, or that has raised them . . . may go to jail or may be in trouble or they may not see them again. [¶] And that person may have reinforced that behavior by telling . . . the victim that's what's going to happen, or the victim if they're sophisticated enough can make that inference on their own." The prosecutor also asked Benavides about widely-held stereotypes about child molesters and whether they were accurate. Benavides responded, "In my experience, I can say that I've probably had out of the hundreds of cases that I have investigated ten at the most cases where . . . the suspect was unknown to the victim. The rest of those cases are all a victim who knows their perpetrator. [¶] . . . [¶] I would say probably two thirds to three quarters [are direct parental authority cases]."

Benavides also explained why a victim may not be able to distinguish repeated instances of abuse. "[A]s we do things over and over again, for example, even innocuous things like . . . getting gas, if those things . . . happen over and over again, they sort of become indistinguishable one from the other. [¶] And this behavior also sort of gets indistinguishable. . . . I . . . might only be able to pull out landmark events in their memory, for example, the first time, the last time, or a time when something was different, particularly violent, something changed . . . ."

2.      *Analysis*

Ramirez contends that Benavides's testimony was improperly tailored to reflect the facts of this case, making it appear that Doe was telling the truth. Contrary to the People's assertion that Ramirez forfeited this argument, we conclude he adequately preserved it. (See *People v. Perez, supra,* 182 Cal.App.4th at p. 245, fn. 5.) In any event, the trial court did not abuse its discretion in admitting the testimony.

"Supreme Court precedent requires that expert testimony related to [CSAAS] be narrowly confined, subject to a proper foundational showing that such evidence is necessary to rebut popular misconceptions which would challenge the victim's credibility. After the testimony has been received, the jury must be admonished so that it understands the limited purpose for admitting such evidence." (*Bowker, supra,* 203 Cal.App.3d at pp. 387–388.)

16

In *Bowker, supra,* 203 Cal.App.3d 385, a psychologist testified "at great length" on CSAAS and explained in detail each of the five stages of the syndrome theory. (*Id.* at p. 389.) When asked why a child would doubt that an adult believed the child's claim, the expert responded as a hypothetical child: " ' "If they believe me, why are they taking me away from my mom? If they believe me . . . , why are they bringing me in [this courtroom]? How many times do I have to say it? I told the lady at the hospital, the policeman, I told the detective, I told the guy downtown in the suit, and they took me into this big courtroom." ' " (*Id.* at pp. 389–390.)

The *Bowker* court stressed: "It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter—given the current state of scientific knowledge—clearly is not." (*Bowker, supra,* 203 Cal.App.3d at p. 393.) The *Bowker* court concluded that the psychologist's testimony exceeded the permissible bounds of CSAAS evidence, as it "was replete with comments designed to elicit sympathy for child abuse victims and solicitations that children should be believed." (*Id.* at p. 394.) "[T]he picture painted by [the psychologist also] happened to be of the two children in the case," in that his comment, " 'Why are they taking me away from my mom?' " directly mirrored the fact that complaining witnesses had been removed from parental home as a result of sex abuse investigation. (*Ibid.*) Most troubling was that, "by delineating each stage of the CSAAS theory, [the expert] constructed a 'scientific' framework into which the jury could pigeonhole, the facts of the case. Thus, even though [the psychologist] was precluded from using CSAAS as a predictor of child abuse, the jury was free to superimpose these children on the same theory and conclude abuse had occurred." (*Id.* at p. 395.)

Here, the expert testimony did not go beyond that found permissible in *Bowker*. Ramirez cross-examined Doe regarding the timing of her reports to police as well as the timing and details of specific molestations, which tended to challenge her credibility.

Benavides's testimony helped explain why Doe's delay in reporting the alleged abuse, as well as her inability to pin down specific instances, was not inconsistent with her claim that she was so abused. Benavides couched his testimony in terms of victims as a class, he did not refer to Doe specifically. Benavides's testimony regarding the lack of any profile for a "typical" child molester was also admissible. (See *People v. McAlpin, supra,* 53 Cal.3d at p. 1302 [without expert testimony "many jurors would tend to rely . . . on the widespread public image of the child molester as an old man in shabby clothes who loiters in playgrounds or schoolyards and lures unsuspecting children into sexual contact by offering them candy or money"]; *id.* at pp. 1302–1304.)

The trial court also properly instructed the jury with CALCRIM No. 1193: "You have heard testimony from Inspector Benavides regarding dispelling common misconception of the behavior of sexual assault victims. [¶] Inspector Benavides's testimony about the behavior of sexual assault victims *is not evidence that the defendant committed any of the crimes charged* against him. [¶] You may consider this evidence only in deciding whether or not Doe's conduct was not inconsistent with the conduct of someone who had been molested and in evaluating the believability of her testimony." (Italics added.) We must presume the jury followed this instruction. (*People v. Pinholster, supra,* 1 Cal.4th at p. 919.) Accordingly, it is extremely unlikely Benavides's testimony was used improperly to find Doe had been molested. The court did not abuse its discretion in admitting Benavides's challenged expert testimony.[8]

---

[8] Our conclusion is not altered by Ramirez's reliance on *People v. Roscoe* (1985) 168 Cal.App.3d 1093, in which a psychologist opined that the complaining witness " 'was diagnosed as a victim of child molest.' " (*Id.* at pp. 1098, 1095.) The *Roscoe* court held "the expert testimony authorized . . . to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*Id.* at p. 1100, fn. omitted.) In reaching that conclusion, the court observed: "Thus, for example, a victim whose credibility is attacked for initially denying that he had been molested could be rehabilitated by expert testimony that such denials are more likely than not in molestation cases. The testimony would not be that this particular child was a victim of

18

C.    *Ineffective Assistance of Counsel*

Next, Ramirez maintains his trial counsel provided ineffective assistance by failing to object to admission of Doe's prior statements to police.  Specifically, he contends Doe's recorded police interview and earlier statements to Moss were hearsay.

"In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.'  [Citations.]  Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.'  [Citation.]  If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'  [Citations.]  If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.' "  (*People v. Ledesma* (2006) 39 Cal.4th 641, 745–746; *People v. Lopez* (2008) 42 Cal.4th 960, 966.)

We conclude that Ramirez's trial counsel was not ineffective in failing to object to admission of the recorded April 2013 interview with Hutton or Doe's March 2013 statements to Moss.  First, even if we assume that an objection could have properly been sustained, " 'failure to object will rarely establish ineffective assistance.' "  (*People v. Carrasco* (2014) 59 Cal.4th 924, 985.)  "Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight.  [Citation.]  'When a defendant

molestation, causing him to react in a certain way, but rather that as a class victims of molestation typically make poor witnesses, and are reluctant to disclose or discuss the sordid episodes."  (*Id.* at p. 1099.)  Benavides's testimony was in the latter vein.

makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" [citation], the contention must be rejected.' [Citation.] A reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*People v. Kelly* (1992) 1 Cal.4th 495, 520.) " ' "Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." ' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1052.)

Here, Ramirez's trial counsel was not asked to explain why he did not object. We agree with the People that Ramirez's trial counsel may very well have acted with a tactical purpose when he failed to object—i.e., he believed admission of Doe's statements to police would be helpful to the defense to the extent her prior statements revealed inconsistencies with her trial testimony. In his cross-examination of Doe, Ramirez asked about the substance of her prior statements to police, in an apparent attempt to highlight such inconsistencies.[9] Ramirez also referred to the asserted inconsistencies in his closing

_____

[9] Specifically, the record reflects the following exchange between Doe and Ramirez's trial counsel:

"Q. Now, when you were originally talking with . . . Deputy Moss, the first time that you had a conversation with the police, you disclosed to Deputy Moss that it was in [Ramirez's brother's] house where the abuse actually started; is that true?

A. No.

Q. . . . So what your testimony is is that the abuse happened not at [Ramirez's brother's] house but somewhere else?

A. Yes.

Q. And do you recall telling Deputy Moss that it happened in Mill Valley when you were sleeping on a pullout couch?

A. No. No. [¶] . . . [¶]

Q. Now, you've described the frequency of abuse at the Mill Valley house as I think something in the neighborhood of a couple times a week.

A. Yes.

argument. Of course, Ramirez is correct that Doe's statements to police were potentially damaging to Ramirez because they were largely consistent with her trial testimony. "Competent counsel often are confronted with tactical choices that have cons as well as pros; a fortiori, they are permitted, indeed required, to make them." (*People v. Kelly, supra,* 1 Cal.4th at p. 522.) This is not a case where there could be no satisfactory explanation for counsel's failure to object. The pretrial discussion between counsel and the court regarding section 356 further supports the presumption Ramirez's trial counsel took a calculated risk that, if he chose to elicit the substance of any recorded statement, the prosecution could move to admit the entire recording.[10] Ramirez has not rebutted the presumption his trial counsel elected not to object for a valid tactical reason.

Furthermore, an objection would not have been meritorious. Ramirez maintains his counsel should have objected when, to counter his cross-examination of Doe, the prosecution offered excerpts (and eventually the entire recording) from Doe's April 2013 interview, as well as Moss's testimony describing Doe's statements in March 2013.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter

---

Q. Okay. Do you remember describing the abuse to the deputies when you had interviews with them as happening more frequently than that?
A. Well, it happened all the time, . . . I can't say exactly how many times a week it happened but it happened a lot. [¶] . . . [¶]
Q. And do you recall telling Deputy Hutton that when you would put on clothes that you wore sometimes up to ten pairs of pants?
A. Yes. [¶] Well, I mean ten pairs of pants? [¶] Well, maybe it was over exaggerated. But maybe like four. [¶] . . . [¶]
Q. And . . . do you recall telling Deputy Moss and Deputy Hutton that you were kind of exhausted all the time?
A. Yes. Absolutely."

[10] Section 356 provides, in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

stated." (§ 1200, subd. (a).) Unless an exception applies, "hearsay evidence is inadmissible." (§ 1200, subd. (b).) Here, although Doe's statements to police were made out of court and were offered for their truth, section 356 acts as an applicable exception to the hearsay rule. (See *People v. Harrison* (2005) 35 Cal.4th 208, 239 ["[o]nce defendant had introduced a portion of [a witness's] interview with [the police officer] into evidence, the prosecution was entitled to introduce the remainder of [the witness's] interview to place in context the isolated statements of [the witness] related by [the officer] on direct examination by the defense"]; *People v. Parrish* (2007) 152 Cal.App.4th 263, 269.)

The purpose of section 356 is "to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156.) " 'In applying . . . section 356 the courts do not draw narrow lines around the exact subject of inquiry. "In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have some bearing upon, or connection with, the admission or declaration in evidence." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 959, italics omitted.) Because Ramirez's trial counsel elicited some of the substance of Doe's statements regarding the molestations to both Moss and Hutton during cross-examination, the entirety of her conversations with those officers was admissible. Ramirez provides no argument regarding section 356 and has not shown his trial counsel's performance was deficient.

In any event, even if trial counsel's failure to object fell below the objective standard of reasonableness, it was not prejudicial. Doe's police interview statements were largely repetitive of her testimony at trial. Thus, by virtue of trial counsel's failure to object, the jury was not exposed to significantly new or different incriminating evidence. Furthermore, the case against Ramirez was overwhelming: Doe's testimony was corroborated by Ramirez's repeated pretrial admissions—in a family meeting, a

22

pretext call, a police interview, and an apology letter. Ramirez's defense—that he repeatedly admitted serious criminal conduct to spare Sandra's feelings and help Doe "come to terms" with their consensual sex—is inherently improbable. It is not reasonably probable Ramirez would have achieved a more favorable result but for trial counsel's failure to object. (*People v. Carrasco, supra,* 59 Cal.4th at p. 986; *People v. Lopez, supra,* 42 Cal.4th at p. 966.)

D.      *Cumulative Error*

Ramirez also argues that the cumulative effect of the asserted errors requires reversal of the judgment. We have rejected all of Ramirez's arguments on the merits. Ramirez was entitled to a trial "in which his guilt or innocence was fairly adjudicated." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) He received such a trial.

E.      *Restitution Order*

Finally, Ramirez maintains the $900,000 restitution award was an abuse of discretion because it was impermissibly based, in part, on loss caused by uncharged offenses. "A victim's restitution right is to be broadly and liberally construed." (*People v. Mearns* (2002) 97 Cal.App.4th 493, 500.) "With one exception, restitution orders are limited to the victim's economic damages." (*People v. Smith* (2011) 198 Cal.App.4th 415, 431 (*Smith*).) The exception is found in Penal Code, section 1202.4, subdivision (f)(3)(F), which authorizes a trial court to award restitution in "a dollar amount that is sufficient to *fully* reimburse the victim [for] . . . : [¶] . . . [¶] Noneconomic losses, including, but not limited to, psychological harm, for felony violations of [Penal Code section] 288." (Italics added.) "[W]e review the trial court's restitution order for abuse of discretion." (*People v. Giordano* (2007) 42 Cal.4th 644, 663.)

At sentencing, the prosecution requested a restitution award of $13 million—$1 million for each month of abuse in the charged period—to compensate Doe for pain and suffering. Ramirez opposed the request as excessive. In awarding Doe $900,000 for noneconomic loss, the trial court explained: "*Jane Doe was the victim in all 26 counts* of forcible lewd act upon a child in violation of Penal Code Section 288(b)(1) on which [Ramirez] was convicted. Jane Doe was molested by [Ramirez], her mother's boyfriend

23

and the only father figure in her life, *frequently and repeatedly from the age of approximately eight or nine years old until she was fifteen years old.* Jane Doe felt trapped, terrified each night *for the bulk of her childhood* that [Ramirez] would come into her bedroom in the middle of the night to molest her again. [¶] . . . [¶] Although it is impossible to know the extent to which [Ramirez's] abuse of Jane Doe has impacted the remainder of her life, no one can reasonably contest that [Ramirez's] long-term and extensive molestation of Jane Doe caused her immeasurable psychological harm. Jane Doe has suffered the effects of the defendant's abuse for her entire life, and will continue to suffer for the remainder of her life. Based upon Jane Doe's testimony at trial, and upon the exhibits and authorities submitted by the People, the Court concludes that an award of $900,000 for emotional distress, past and future, is appropriate." (Italics added.)

" 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " (*People v. Mearns, supra,* 97 Cal.App.4th at p. 499.) "Unlike restitution for economic loss, however, loss for noneconomic loss is subjectively quantified." (*Smith, supra,* 198 Cal.App.4th at p. 436.) We will affirm such a restitution award "that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court." (*Ibid*.)

In *Smith, supra,* 198 Cal.App.4th 415, the defendant was convicted of molesting his stepdaughter from the time she was eight years old until she turned 15. (*Id.* at pp. 419, 420–424.) Evidence of uncharged offenses against the complaining witness was also presented. (*Id.* at pp. 421–422.) The court awarded $750,000 in noneconomic restitution to the victim, noting that the defendant's acts against his stepdaughter actually occurred over a 15-year period—between age eight to age 23. The court multiplied that 15 years by $50,000 per year, thus arriving at $750,000. (*Id.* at pp. 420, 433.)

On appeal from the restitution order, the defendant maintained the amount awarded was an abuse of discretion, in part because it was based on the victim's suffering "during years after the crimes were committed." (*Smith, supra,* 198 Cal.App.4th at

24

p. 435; *id.* at pp. 420.) The *Smith* court referenced the civil jury instruction for noneconomic loss, and adopted the standard for reviewing such damage awards.[11] (*Smith,* at p. 436.) The court concluded $750,000 in noneconomic damages for years of sexual abuse did not shock the conscience or suggest passion, prejudice or corruption. (*Ibid.*) In reaching that conclusion, the *Smith* court cited *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1033, 1059–1061, in which a jury award of $1.5 million in noneconomic damages was affirmed for a single act of molestation. (*Smith,* at pp. 436–437.) The *Smith* court was also untroubled by the trial court's reference to years beyond those in which the charged offenses occurred. "As would a jury, the court was searching for some way to quantify [the victim's] pain and suffering. And there is no credible argument, especially on the facts of this case, that [the victim's] psychological harm ended when she was 15 years old. Accordingly, the court did not abuse its discretion." (*Id.* at p. 437.)

Here, as in *Smith,* the trial court may have referred to the entire history of Ramirez's offenses against Doe. However, contrary to Ramirez's assertion, we see no evidence that the trial court ordered him to pay any sum of restitution for loss attributable solely to uncharged conduct. It was reasonable for the trial court, who observed Doe's demeanor, to conclude that her pain and suffering did not end in 1994 and will continue indefinitely. The trial court's award does not shock the conscience or suggest passion, prejudice or corruption.[12]

### III.   DISPOSITION

The judgment and restitution order are affirmed.

---

[11] CACI No. 3905A provides in relevant part: "No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense."

[12] Ramirez misplaces his reliance on *People v. Woods* (2008) 161 Cal.App.4th 1045, *People v. Lai* (2006) 138 Cal.App.4th 1227, and *People v. Percelle* (2005) 126 Cal.App.4th 164, as none of these cases involve an award of noneconomic damages for pain and suffering under Penal Code section 1202.4, subdivision (f)(3)(F).

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
SIMONS, J.